JS-6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit association,<br><br>      Plaintiff,<br><br>  v.<br><br>SPS TECHNOLOGIES LLC, a Pennsylvania corporation.<br><br>      Defendant. | Case No.: 2:24-cv-04118-MWF(PDx)<br><br>**CONSENT DECREE** |

## CONSENT DECREE

**WHEREAS,** Plaintiff Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff") is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California, with its main office in Los Angeles, California;

**WHEREAS,** LA Waterkeeper is dedicated to the preservation, protection and defense of the surface, ground, coastal and ocean waters of Los Angeles County from all sources of pollution and degradation;

**WHEREAS,** Defendant SPS Technologies LLC ("SPS Technologies") ("Defendant"), owns and operates a facility at 1700 W. 132nd Street in Gardena, California under Waste Discharger Identification number 4 19I023455 ("Facility");

**WHEREAS,** the Facility's industrial activities consist of manufacturing metal fasteners for the aerospace industry, including without limitation airframe structural nuts and bolts. The Facility's industrial activities are categorized under Standard Industrial Classification ("SIC") Code 3452 (Bolts, Nuts, Screws, Rivets, and Washers);

**WHEREAS,** storm water discharges associated with industrial activity at the Facility are regulated by the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order 2014-0057-DWQ, as amended by Order Nos. 2015-0122-DWQ and 2018-0028-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Load Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, at the Facility ("General Permit" or "Permit")[1], and the Federal

---

[1] Any references to the "General Permit" or "Permit" herein shall be to the then-effective version, regardless of whether such changes are the result of amendments, revisions, reissuance, or similar modification of material terms. Any reference in this Consent Decree to specific sections or subsections of the General Permit that are moved, modified, or otherwise changed in a subsequent version of the General Permit shall be to such subsequent reference(s) as if set forth herein, *e.g.*, the current §XI.B.6.c may be renumbered as §XI.B.7.c, combined into the current §XI.B.6.d, or split into a new §XI.B.6.c and §XI.B.6.d.

1  Water Pollution Control Act, <u>33 U.S.C. §§ 1251</u>, *et seq.* ("Clean Water Act" or

2  "CWA"), Sections 301(a) and 402, <u>33 U.S.C. §§ 1311(a)</u>, <u>1342</u>;

3    **WHEREAS**, Defendant's operations at the Facility result in discharges of

4  pollutants into waters of the United States and are properly subject to regulation by

5  the Clean Water Act Sections 301(a) and 402 and General Permit. <u>33 U.S.C. §§</u>

6  <u>1311(a)</u>, <u>1342</u>;

7    **WHEREAS**, the General Permit requires all permittees, including Defendant,

8  to comply with, inter alia, the following mandates: (1) develop and implement a

9  storm water pollution prevention plan and a storm water monitoring implementation

10  plan, (2) control pollutant discharges using, as applicable, best available technology

11  economically achievable or best conventional pollutant control technology to prevent

12  or reduce pollutants through the development and application of Best Management

13  Practices, which must be detailed in and timely updated in the SWPPP, (3) reduce

14  and eliminate discharges necessary to comply with any and all applicable Water

15  Quality Standards, and (4) implement a monitoring and reporting program, including

16  the MIP, designed to assess compliance with the Permit;

17    **WHEREAS**, on March 14, 2024, Plaintiff issued a notice of intent to file suit

18  ("60-Day Notice Letter") to Defendant, the registered agent for service of process, the

19  Administrator of the United States Environmental Protection Agency ("U.S. EPA"),

20  the Executive Director of the State Water Resources Control Board ("State Board"),

21  the Executive Director Los Angeles Regional Water Quality Control Board

22  ("Regional Board"), and the Regional Administrator of EPA Region IX, alleging

23  violations of the Clean Water Act and the General Permit;

24    **WHEREAS**, on May 17, 2024, LA Waterkeeper filed a complaint against

25  Defendant in the Central District of California ("Court"), Civil Case No. 2:24-cv-

26  04118 ("Complaint");

27

28

CONSENT DECREE                                    Case No.: 2:24-cv-04118
125476359.1 0060972-00026

**WHEREAS**, Plaintiff's Complaint alleged ongoing violations of the General Permit and the Clean Water Act for Defendant's discharges of pollutants into storm drains and surface waters, including Dominguez Channel, Dominguez Channel Estuary, Los Angeles and Long Beach Harbor Waters, and the Pacific Ocean (collectively, "Receiving Waters");

**WHEREAS**, Plaintiff and Defendant (collectively, "Settling Parties" or "Parties") agree that it is in their mutual interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the 60-Day Notice Letter and Complaint without further proceedings;

**WHEREAS**, all actions taken by Defendant pursuant to this Consent Decree shall be made in compliance with all applicable federal, state and local laws, rules and regulations.

**NOW, THEREFORE, IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1.    The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the CWA, 33 U.S.C. § 1365(a)(1)(A).

2.    Venue is appropriate in the Central District Court pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations are taking place is located within this District.

3.    The Complaint states a claim upon which relief may be granted against Defendant pursuant to Section 505 of the CWA, 33 U.S.C. § 1365.

4.    LA Waterkeeper has standing to bring this action.

5.    The Court shall retain jurisdiction over this action for purposes of interpreting, modifying, or enforcing the terms of this Consent Decree, or as long thereafter as necessary for the Court to resolve any motion to enforce this Consent

CONSENT DECREE
125476359.1 0060972-00026                                                    Case No.: 2:24-cv-04118

Decree, but only regarding issues raised within the Term (as defined below) of this Consent Decree.

## I.    OBJECTIVES

6.    It is the express purpose of the Settling Parties through this Consent Decree to further the objectives of the Clean Water Act, and to resolve all issues alleged by LA Waterkeeper in its 60-Day Notice Letter and Complaint. These objectives include without limitation compliance with the provisions of this Consent Decree, compliance with all terms and conditions of the General Permit, and compliance with all applicable sections of the CWA.

7.    In light of these objectives and as set forth fully below, Defendant agrees to comply with the provisions of this Consent Decree, terms and conditions of the General Permit, and all applicable sections of the CWA at the Facility.

## II.    AGENCY REVIEW AND DEFINITION

### A.    AGENCY REVIEW OF CONSENT DECREE

8.    <u>Agency Review</u>. Plaintiff shall submit this Consent Decree to the United States Department of Justice and U.S. EPA (the "Federal Agencies") for agency review consistent with 40 C.F.R. § 135.5. The agency review period expires forty-five (45) calendar days after receipt by the Federal Agencies, as evidenced by certified return receipts, or upon the date that the Federal Agencies provide a no objection letter, whichever is earlier ("Agency Review Period"). In the event the Federal Agencies object to entry of this Consent Decree or to any portion of this Consent Decree, the Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies. If the Parties are unable to resolve any issue(s) raised by the Federal Agencies in their comments, the Parties agree to expeditiously seek a settlement conference with the assigned Magistrate Judge to resolve any issue(s).

9. <u>Court Notice</u>. Plaintiff shall notify the Court of the receipt date by the Federal Agencies, as required by 40 C.F.R. § 135.5, in order to coordinate the Court's calendar with the 45-day review period.

10. <u>Entry of Consent Decree</u>. Following the expiration of the Agency Review Period, Plaintiff shall submit the Consent Decree to the Court for entry.

**B.   DEFINITIONS**

11. Unless otherwise expressly defined herein, terms used in this Consent Decree which are defined in the CWA or in regulations or rules promulgated under the CWA have the meaning assigned to them in the statutes or regulations or rules. Whenever terms listed below are used in this Consent Decree, whether or not capitalized, the following definitions apply:

a.   "BAT" means the Best Available Technology Economically Achievable.

b.   "BCT" means the Best Conventional Pollutant Control Technology, and collectively with BAT is referred to herein as "BAT/BCT."

c.   "BMPs" means Best Management Practices as defined in Attachment C (Glossary) of the General Permit.

d.   "Consent Decree" means this Consent Decree and any attachments or documents incorporated by reference.

e.   "Day" means a calendar day. In computing any period of time under this Consent Decree, where the last day of such period is a Saturday, Sunday, or Federal or State Holiday, the period runs until the close of business on the next day that is not a Saturday, Sunday, or Federal or State Holiday.

f.   "Design Storm" means the design storm calculated in accordance with the design storm standards set forth in General Permit for

Volume-based BMPs (General Permit § X.H.6.a.) or Flow-based BMPs (General Permit § X.H.6.b.).

g.    "Discharge Point" means each discharge location designated in the then-current SWPPP for the Facility.

h.    "Effective Date" means the effective date of this Consent Decree, which shall be the date of full execution by the Parties.

i.    "Entry Date" means the day this Consent Decree is approved and entered by the Court.

j.    "Forecasted Rain Event" means a forecasted rain event with fifty percent (50%) or greater chance of producing 0.1 inches over a calendar day as determined by the National Oceanic and Atmospheric Administration (http://forecast.weather.gov/) for the "90249, West Athens, CA, USA."[2]

k.    "MIP" means a Monitoring Implementation Plan.

l.    "PPT" means Pollution Prevention Team.

m.    "Qualified Industrial Storm Water Practitioner" or "QISP" shall have the definition set forth at General Permit § IX.A.1.

n.    "Qualifying Storm Event" shall have the definition set forth at General Permit § XI.B.1.

o.    "Reporting Year" means the period from July 1 of a given calendar year to June 30 of the following calendar year.

p.    "SMARTS" means the California State Water Resources Control Board's Stormwater Multiple Application and Report Tracking System.

q.    "SWPPP" means a Storm Water Pollution Prevention Plan.

---

[2] Available at https://forecast.weather.gov/MapClick.php?lat=33.9165&lon=-118.3098.

CONSENT DECREE
125476359.1 0060972-00026                                                          Case No.: 2:24-cv-04118

r.  "Term" means the period between the Effective Date and the "Termination Date."

s.  "Termination Date" means the latest of:

    i.  June 30 following three (3) years from the Effective Date;

    ii.  June 30 following an advanced treatment system operating for a complete Wet Season, if ever;

    iii.  seven (7) days from the conclusion of any proceeding or process to enforce the Consent Decree initiated prior to later of dates in paragraphs 11.r.i. and 11.r.ii. above; or

    iv.  seven (7) days from Defendant's completion of all payments and other affirmative duties required by this Consent Decree.

t.  "Wet Season" means the period beginning October 1st of any given calendar year and ending June 30th of the following calendar year.

## III.  COMMITMENTS OF THE SETTLING PARTIES

### A.  STORM WATER POLLUTION CONTROL BEST MANAGEMENT PRACTICES

12.  <u>Non-Storm Water Discharge Prohibition</u>. Any unauthorized non-storm water discharge, as defined in the General Permit, shall be a violation of this Consent Decree.

13.  <u>Current and Additional Best Management Practices</u>. At all times, Defendant shall implement BMPs identified in its SWPPP and BMPs described herein, and shall develop and implement additional BMPs as necessary to comply with the provisions of this Consent Decree and the General Permit, including but not limited to those necessary to comply with: (1) BAT/BCT-level pollutant reductions; (2) each of the General Permit's Receiving Water Limitations; and (3) all applicable TMDL-related requirements.

Docusign Envelope ID: 29CBCD5A-0C85-4A54-9AB5-F36971A3DEF6

14.    <u>Rain Data</u>. During the Term, rain data from National Oceanic and
Atmospheric Administration (http://forecast.weather.gov/) for the "90249, West
Athens, CA, USA" shall be conclusive of precipitation quantities and timing for
purposes of this Consent Decree.

15.    <u>Aerial Deposition Assessment</u>. Defendant shall complete an aerial
deposition survey according to the procedures detailed in Attachment 1 attached
hereto. Upon completion, Defendant shall provide LA Waterkeeper with a written
report ("Aerial Deposition Sampling Report") detailing the outcomes of the survey.
The Aerial Deposition Sampling Report shall contain: (1) a certification under
penalty of law that industrial operations occurring during data collection were
representative of normal Facility activity, i.e., daily intensity, emissions generating
equipment and processes; (2) raw data in the form of laboratory report(s); (3) a
summary of sampling results with maps detailing location and concentration data,
including any statistical analysis and (4) conclusions regarding how, if at all, the
survey data impact the provisions that are contained in this Consent Decree including
whether survey data indicate that parameters should be removed from Table 1; and
(5) conclusions regarding how, if at all, survey data indicate that additional
parameters, including without limitation copper and nickel, should be added to Table
1.[3] LA Waterkeeper shall have fourteen (14) days to review the Aerial Deposition
Sampling Report, after which the Parties shall meet and confer within ten (10) days to
discuss those changes to this Consent Decree, if any, indicated by the data and
assessment.

16.    <u>Structural and Non-Structural BMPs for the Facility</u>. As soon as possible
but no later than sixty (60) days of the Effective Date, unless otherwise noted,
Defendant shall develop and implement the following BMPs at the Facility:

---

[3] In the event copper and/or nickel are added to Table 1, the numeric limits shall be, respectively, 0.20751 mg/L (total)
(interim TNAL) for copper and 0.47 mg/L (dissolved) (California Toxics Rule) for nickel.

CONSENT DECREE                                                          Case No.: 2:24-cv-04118
125476359.1 0060972-00026

a.    Patch, pave, or otherwise resurface areas of degraded concrete,
pavement, or asphalt that is exposed to stormwater at the Facility
to limit the potential for pollutant to settle into holes, cracks, and
similar locations from which pollutants may be difficult to remove
using sweeping techniques required under this Consent Decree;

b.    Remove, replace, coat, and/or paint all steel and galvanized
infrastructure (e.g., gutters, pipes) exposed to storm water which
flows to any drainage area;

c.    Implement a sweeping program that ensures: (i) the Tomcat 28-D
Carbon floor scrubber ("Tomcat") is used to sweep all surface
areas outside the production building, including covered areas
with the potential to contribute pollutants to storm water, at least
twice per month outside of the Wet Season, once per week during
the Wet Season, and within forty eight (48) hours prior to a
Forecasted Rain Event; and (ii) hand sweeping and/or vacuuming
in areas the Tomcat cannot access on the same schedule;

d.    Install and maintain infrastructure to fully isolate, i.e., ensure no
comingling of, any and all storm water "run on" from the Russ
International facility prior to Sample Point 3. The purpose of this
provision is to both allow for independent sampling and analysis
of the "run on" from Russ International.

e.    Install CleanWay® Environmental Partners Storm Clean® catch
basin filtration insert or equivalent technology at Discharge Point
1, which shall be equipped with StormwaterBIOCHAR™ Biochar
Stormwater Treatment Filter Media or equivalent technology and
discharge port (or equivalent) that allows Defendant to collect

CONSENT DECREE                                    Case No.: 2:24-cv-04118
125476359.1 0060972-00026

1    storm water samples representative of the quality of water being

2    discharged from the Facility;

3    f.    Prior to and for the duration of each Wet Season, Defendant shall

4    deploy, secure, and maintain linear media filtration devices (e.g.,

5    "filter socks") using StormwaterBIOCHAR™ Biochar

6    Stormwater Treatment Filter Media or equivalent technology to

7    remove sediments, metals, and organic materials in storm water

8    discharged from the Facility to comply with the numeric standards

9    in Table 1, and shall configure such filter socks to achieve

10    maximum contact time with storm water prior to discharge, *i.e.,* in

11    multiple layers and/or overlapping formations. During the Wet

12    Season, Defendant shall replace the filter socks when degraded or

13    ineffective, including without limitation when there are rips, tears

14    or other visual damage, and/or sampling data demonstrating the

15    filter socks are not sufficiently reducing pollutant concentrations;

16    g.    Design pre-rain protocols in the facility SWPPP, and implement

17    such protocols during the Wet Season prior to a Forecasted Rain

18    Event as close to the event as feasible. Pre-rain protocols shall

19    include (i) inspection of all filtration devices, (ii) removal or

20    rainproof covering of any industrial equipment and/or waste

21    material exposed to storm water with tarps, lids, or other

22    coverings sufficient to prevent exposure to rainfall, including

23    without limitation those stored outside and where roof protection

24    is inadequate.; (iii) relocation of uncontained or uncovered waste

25    receptacles into a covered structure adequate to prevent exposure

26    to rainfall as necessary.

27

28

CONSENT DECREE                                    Case No.: 2:24-cv-04118
125476359.1 0060972-00026

h.    Develop and institute an equipment and vehicle maintenance program that ensures:

    i.    no maintenance activities occur outdoors during wet weather, unless such maintenance is required for safe operation of the Facility, *e.g.*, the forklift breaks down in a location that prevents ingress/egress;

    ii.    maintenance activities occur only in designated work areas or beneath covered maintenance areas; and

    iii.    when maintenance activities must be performed outdoors, action shall be taken to immediately contain, capture, and clean up any discharge or spills of waste fluids to the ground;

i.    Submit to LA Waterkeeper in writing, with photographs, a report listing the completed BMPs within fourteen (14) days of the end of the sixty (60) day time period.

**B.    Sampling at the Facility**

17.    Defendant shall develop a monitoring program consistent with the General Permit. During the 2024-2025 Reporting Year, Defendant shall collect samples of storm water discharge from each of the Facility's Discharge Points[4] identified in the then-current SWPPP, and from the Russ International by-pass from at least six (6) Qualifying Storm Events, including, at minimum, the first three (3) Qualifying Storm Events between July 1 and December 31, and the first three (3) Qualifying Storm Events between January 1 and June 30. In each subsequent

---

[4] At the time this Consent Decree was executed, Defendant collects storm water samples at Discharge Point 1 (a storm water drain inlet adjacent to the Facility's shipping/receiving dock), Discharge Point 2 (east portion of building adjacent to the chemical waste collection area) and Discharge Point 3 (surface flow immediately before storm water exits the south-west corner of the Facility to the neighbor's property). Defendant also collects samples from run-on from the adjacent facility, Russ International, at a fourth point that is east of the building adjacent to the chemical waste collection area.

11

Reporting Year, Defendant shall collect samples of storm water discharge from each

of the Facility's Discharge Points from at least four (4) Qualifying Storm Events,

including, at minimum, the first two (2) Qualifying Storm Events between July 1 and

December 31, and the first two (2) Qualifying Storm Events between January 1 and

June 30. Such sampling shall take place as soon as possible within the four (4) hour

period required by the General Permit § XI.B.5. If Defendant would have been

required to collect samples of storm water discharged from the Facility (i.e., not the

Russ International discharge) during a rain event pursuant to this Consent Decree had

such rain event produced a discharge, but Defendant did not collect samples because

such rain event did not produce a discharge, then Defendant shall document the

inability to sample by taking photographs during the rain event of each Discharge

Point from which no discharge occurred. Defendant shall submit such photographs to

LA Waterkeeper by email, along with the rain data collected from National Oceanic

and Atmospheric Administration (http://forecast.weather.gov/) for the "90249, West

Athens, CA, USA" for the date of such rain event, within ten (10) days of a written

request for such records by LA Waterkeeper.

18.    Sampling Parameters. All samples collected pursuant to this Consent

Decree shall be analyzed for the parameters listed in Table 1. Should Defendant

intend to conduct sampling for any additional parameters that are listed in 40 C.F.R. §

131.38 and/or in the General Permit as a result of changed operations, a revised

pollutant source assessment, or a new mandate from a regulatory agency, such

parameter shall be incorporated into this Consent Decree as if listed in Table 1 for all

purposes, including any Action Plan requirements (as defined below).  Defendant

shall timely (i.e., prior to collection/analysis) notify LA Waterkeeper if it intends to

conduct sampling for any such additional parameters, and the Parties shall meet and

confer regarding the applicable Table 1 limit for such purposes within ten (10) days

of such notification. Where the concentration of a pollutant is "non-detect" in four (4)

1   consecutive samples from Qualifying Storm Events at all Facility Discharge Points

2   (i.e., not the Russ International discharge), Defendant may eliminate the pollutant

3   from future laboratory analyses without violating this Consent Decree.

4       19.    Laboratory and Holding Time. Except for pH samples, Defendant shall

5   deliver all samples to a California-certified environmental laboratory for analysis

6   within allowable hold times, pursuant to 40 C.F.R. Part 136. Analysis of pH will be

7   completed onsite using a portable instrument that is calibrated and used according to

8   the manufacturer's instructions.

9       20.    Detection Limit. Defendant shall request that the laboratory use

10  analytical methods adequate to detect the individual pollutants at or below the values

11  specified in the General Permit and Table 1 below.

12      21.    Reporting. Defendant shall provide complete laboratory results of all

13  samples collected at the Facility to SMARTS in accordance with the General Permit,

14  and within fifteen (15) days of receiving the laboratory report with the results shall

15  either (i) notify LA Waterkeeper by email of such upload to SMARTS or (ii) provide

16  copies to LA Waterkeeper.

17      **B.    REDUCTION OF POLLUTANTS IN DISCHARGES**

18      22.    Table 1 Numeric Limits. Defendant shall develop and implement BMPs

19  for storm water discharges from the Facility that reduce pollutant concentrations to

20  levels at or below those in Table 1, or subsequently added to Table 1 per paragraphs

21  15 and/or 18.

22

23

24

25

26

27

28

---

13

**TABLE 1**[5]

| Analytes | Values | Source of Limit |
|---|---|---|
| pH | 6.5 – 8.5 s.u. | Basin Plan |
| total suspended solids | 100 mg/L (total) | U.S. EPA Benchmark |
| oil & grease | 15 mg/L (total) | NAL |
| aluminum | 1.1 mg/L (total) | U.S. EPA Benchmark |
| iron | 1.0 mg/L (total) | NAL |
| nitrate + nitrite nitrogen | 0.68 mg/L (total) | U.S. EPA Benchmark |
| zinc | 0.89887 mg/L (total) | TNAL (interim) |

23.    Table 1 Exceedances. An "Exceedance" occurs when the concentration of any pollutant or pollutants exceeds the relevant Table 1 numeric limit in any two (2) storm water samples[6] from the Facility's sampling locations in a given Reporting Year during the Term. An Exceedance shall constitute a violation of this Consent Decree.

24.    Action Plans. As of the Effective Date, and for the remainder of the Term, if (a) Defendant has an unauthorized non-storm water discharge in violation of paragraph 12, (b) storm water samples establish the occurrence of an Exceedance as defined in paragraph 23, or (c) after the Treatment System (as defined in paragraph 24.b) is fully installed, operational, and optimized, if ever, Defendant shall prepare and submit to LA Waterkeeper a plan for eliminating future Exceedances, achieving compliance with the non-storm water discharge prohibition, or eliminating discharges in smaller than a Design Storm, as applicable ("Action Plan"). A complete Action

---

[5] The numeric limits listed in Table 1 are for reference only, and the Table 1 limit applicable to each parameter shall be the then-effective limit provided by the applicable source, e.g., if the U.S. EPA Benchmark for aluminum is either increased to 1.2 mg/L or decreased to 1.0 mg/L, such new Benchmark, and not 1.1 mg/L, shall be used as the Table 1 limit for the purposes of this Consent Decree as if set forth herein.

[6] As examples: (i) samples from both Sample Point 1 and Sample Point 2 exceeding the 1.1 mg/L standard for aluminum on December 28, 2024; (ii) samples from Sample Point 1 exceeding the 1.1 mg/L standard for aluminum on December 28, 2024 and on March 15, 2025; or (iii) a sample from Sample Point 1 exceeding the 1.1 mg/L standard for aluminum on December 28, 2024, and a sample from Sample Point 2 exceeding the 1.1 mg/L standard for aluminum on March 15, 2025.

CONSENT DECREE                                                                 Case No.: 2:24-cv-04118
125476359.1 0060972-00026

Plan shall be submitted to LA Waterkeeper within thirty (30) days of the receipt of the laboratory report demonstrating the Exceedance.

    a.   <u>Action Plan Requirements</u>. Each complete Action Plan submitted to LA Waterkeeper shall include at a minimum:

       i.   the identification of the pollutant(s) discharged in excess of Table 1 limit(s), the applicable unauthorized non-storm water discharge, and/or the applicable discharge in smaller than a Design Storm;

       ii.   a narrative assessment of the source (i.e., the industrial activity and/or BMP deficiency) of each pollutant for which an Exceedance occurred, applicable unauthorized non-storm water discharge, and/or applicable discharge in smaller than a Design Storm;

       iii.   the identification of additional BMPs that shall be implemented to achieve compliance with the Table 1 limit(s), unauthorized non-storm water discharge prohibition, and/or Design Storm requirement; and

       iv.   a detailed implementation schedule that ensures all BMP improvements are completed as soon as possible, and in no event later than August 1 following the submission of the Action Plan, unless a later implementation date is mutually agreed upon by the Parties. Within thirty (30) days of complete implementation of the BMPs detailed in an Action Plan, Defendant shall confirm to LA Waterkeeper in writing, with photographs, that the Action Plan has been fully implemented.

15

b.  Advanced Treatment System. Additionally, beginning in the 2025-2026 Reporting Year and for the remaining duration of the Term, the first Action Plan triggered as a result of an Exceedance shall include a plan for the implementation and operation of an advanced storm water treatment system ("Treatment System").

i.  The proposed system shall either include pre-settling, polymer- or electronically-assisted coagulation, followed by filtration, or Defendant may propose the use of an alternative treatment technology of equivalent effectiveness as demonstrated by independent, third-party data, i.e., not the manufacturer's own data, for pollutants listed in Table 1.

ii.  Treatment System Design Standards. The Treatment System shall be capable of treating storm water runoff generated at the Facility by a Design Storm and reducing pollutant concentrations to achieve compliance with meet the Table 1 numeric limit(s), as well as the design plans and calculations of these additional BMPs.

c.  Action Plan Proposed BMPs. The following BMPs should generally be evaluated for inclusion in Action Plans to attain the Table 1 levels in the Facility's storm water discharges:

i.  Hydrologic Controls. Installation of additional berms or equivalent structural controls necessary to reduce or prevent storm water from flowing off site other than through the engineered storm water conveyance system or storm water retention or treatment facilities.

16

ii.     Sweeping. The increased/more frequent use of sweepers
        and manual sweeping in otherwise inaccessible areas.

iii.    Treatment Systems. Installing additional components or
        systems, or otherwise improving, an advanced storm water
        treatment system, or making changes to the operation and
        maintenance protocols for such system, to provide more
        effective filtration treatment of storm water prior to
        discharge.

iv.     Evaluation of Existing BMPs. Replacing, rehabilitating, or
        eliminating existing BMPs, taking into account the age of
        the BMPs involved or employed, the engineering aspect of
        the application of various BMPs, and any adverse
        environmental impact of the BMPs.

d.      Action Plan Review. LA Waterkeeper shall have thirty (30) days
        upon receipt of Defendant's complete Action Plan to provide
        Defendant with comments. Within twenty-one (21) days of
        receiving LA Waterkeeper's proposed revisions to an Action Plan,
        Defendant shall consider each of LA Waterkeeper's recommended
        revisions and accept them or justify in writing why any comment
        is not incorporated. Action Plan(s) developed and implemented
        pursuant to this Consent Decree are an obligation of this Consent
        Decree. Any disputes as to the adequacy of an Action Plan shall
        be resolved pursuant to the dispute resolution provisions of this
        Consent Decree, set out in Section IV below. Disputes regarding
        the adequacy of a particular BMP shall not impact the schedule for
        implementing any other BMP set forth in the Action Plan.

e.    Defendant shall revise the then-current SWPPP to reflect the changes required by any Action Plan, as set forth in Paragraph 29.b.i below.

f.    <u>Action Plan Payments</u>. Defendant shall pay four thousand dollars ($4,000.00) to LA Waterkeeper at the same time an Action Plan is submitted. Payment shall be made to "Los Angeles Waterkeeper" via certified mail, return receipt requested to Los Angeles Waterkeeper, c/o Senior Attorney, 360 E 2nd Street, Suite 250, Los Angeles, CA 90012. Failure to submit a payment as required under this Paragraph will constitute a breach of the Consent Decree.

## C.    VISUAL OBSERVATIONS

25.    <u>Storm Water Discharge Observations</u>. During the Term, Defendant's appropriately trained staff shall conduct visual observations during the Facility's operating hours during at least four QSEs as required by Section XI.A.2 of the General Permit. Such inspections shall comply with all requirements of Section XI.A.2 of the General Permit.

26.    <u>Monthly Visual Observations</u>. During the Term, Defendant's appropriately trained staff shall conduct monthly non-storm water visual observations of the Facility. Such inspections shall comply with all requirements of Section XI.A.1 of the General Permit. Such monitoring shall include outfalls, Discharge Points, outdoor industrial equipment and storage areas, outdoor industrial activities areas, BMPs, and all other potential sources of industrial pollutants. All Discharge Points shall also be inspected for accumulation of dust, sediment, sand, grit, oily substances, oily sheens upon any standing water, and other materials associated with operations at the Facility. During the Wet Season, such inspections shall further include observations of all storm water BMPs that are used only during the Wet Season at the

CONSENT DECREE                                                    Case No.: 2:24-cv-04118
125476359.1 0060972-00026

Facility to ensure that operational BMPs are being implemented, structural BMPs are in good condition or working order, and that BMPs have been effective in producing clean conditions at the Facility. Such inspections shall further include observation as to whether there are any non-storm water discharges from the Facility.

27.    <u>Visual Observations Records</u>. Defendant shall maintain observation records, including photographs where applicable, to document compliance with paragraphs 26 and 27. Such records shall include, but not be limited to, the persons who completed the inspection, the date of the inspection, and notes sufficient to describe the completed activity and all observations thereof, including but not limited to: (i) whether BMPs are in a proper, working condition; (ii) whether any repair, replacement, or operation and maintenance is needed for any BMPs; (iii) other conditions that have the potential to lead to pollutant loading in storm water discharges; and (iv) photographs of all the foregoing.  Defendant shall provide LA Waterkeeper with a copy of those records within ten (10) days of receipt of a written request from LA Waterkeeper for those records.

28.    <u>Employee Training Program</u>. Within forty-five (45) days of the Effective Date, Defendant shall develop and implement an employee training program that meets the following requirements and ensures (1) that there is a sufficient number of employees at the Facility designated to achieve compliance with the General Permit and this Consent Decree ("Designated Employees"), and (2) that these Designated Employees are properly trained to perform the activities required by the General Permit and this Consent Decree ("Training Program"):

a.    <u>Materials</u>. Training materials should include, at minimum, a detailed Training Manual or Standard Operating Procedure, including drawings and diagrams where appropriate, for reference and use by Defendant's personnel to ensure effective implementation of all BMPs at the Facility;

19

b. <u>Language</u>. The training and training materials shall be available and offered in the language(s) in which relevant employees are fluent. If necessary, Defendant shall provide a translator or translators at all trainings where such translation is likely to improve staff comprehension of the Training Program and improve compliance with this Consent Decree and the General Permit;

c. <u>Training Frequency</u>. Training shall be provided by a QISP familiar with the requirements of this Consent Decree and the General Permit, and shall be repeated as necessary to ensure that all relevant employees are familiar with the requirements of this Consent Decree, the Permit, and the Facility's SWPPP. All relevant new staff shall receive this training before assuming responsibilities for implementing the SWPPP;

d. <u>Sampling Training</u>. Defendant shall designate an adequate number of employees necessary to collect storm water samples as required by this Consent Decree, including training to ensure samples are properly collected, stored, and submitted to a certified laboratory;

e. <u>Visual Observation Training</u>. Defendant shall provide training on how and when to properly conduct visual observations to Designated Employees;

f. <u>Non-Storm Water Discharge Training</u>. Defendant shall train all Designated Employees at the Facility on the General Permit's prohibition of non-storm water discharges, so that Designated Employees know what non-storm water discharges are and how to detect and prevent non-storm water discharges;

CONSENT DECREE
125476359.1 0060972-00026

Case No.: 2:24-cv-04118

g.  <u>Employees</u>. All Designated Employees at the Facility shall participate in the Training Program annually. New Designated Employees shall participate in the Training Program within sixty (60) days of their hiring date; and

h.  <u>Records</u>. Defendant shall maintain training records to document compliance with this Paragraph and shall provide LA Waterkeeper with a copy of these records within ten (10) days of receipt of a written request.

29.  <u>SWPPP Revisions</u>.

a.  <u>Initial SWPPP Revisions</u>. Defendant shall amend the Facility's SWPPP to incorporate the requirements in this Consent Decree and comply with the General Permit and submit the complete, updated SWPPP to LA Waterkeeper within forty-five (45) days of the Effective Date for LA Waterkeeper's review and comment. The complete, updated SWPPP shall contain, at a minimum, the following elements:

i.  A revised pollutant source assessment, including all elements required by section X.G of the General Permit as well as assessments of the potential for the Facility's storm water discharges to contain pollutants for which the Receiving Waters are 303(d) listed and/or have Total Maximum Daily Loads;

ii.  A detailed narrative description and assessment of each industrial activity with the *potential* to impact storm water quality occurring at the Facility as required by section X.G of the General Permit;

21

iii.    Descriptions of all BMPs in accordance with section X.H.4 of the General Permit, including without limitation BMPs required by this Consent Decree;

iv.    A set of site maps that comply with section X.E of the General Permit and provisions of this Consent Decree, including accurately depicting the different drainage areas and flows;

v.    A MIP as required by sections XI and X.I of the General Permit;

vi.    A designation (by position/title) of employees responsible for carrying out storm water management, monitoring, sampling and SWPPP implementation, e.g., visual inspection of each specific area, monitoring each specific BMP, sampling, etc.; and

vii.    A Training Program as described above in paragraph 28.

b.    Additional SWPPP Revisions.

i.    Within thirty (30) days after approval of any Action Plan by LA Waterkeeper (or resolution pursuant to Dispute Resolution), Defendant shall revise the then-current SWPPP to reflect the changes required by the Action Plan and submit the complete, updated SWPPP to LA Waterkeeper for review and comment.

ii.    Within thirty (30) days after any changes in industrial activities, sources of industrial pollutants, or Discharge Points, or changes to sections of the SWPPP identified in the SWPPP as requiring a SWPPP revision (including but not limited to, changes in Facility contacts or PPT

22

members, changes or additions of BMPs, or changes in or additions of industrial activities that impact storm water discharge), Defendant shall revise the then-current SWPPP to reflect such changes and submit the complete, updated SWPPP to LA Waterkeeper for review and comment.

c.    Review of SWPPP.  For any SWPPP updates submitted by Defendant, LA Waterkeeper shall have thirty (30) days upon receipt of the complete, updated SWPPP to provide Defendant with comments. Within thirty (30) days of receiving LA Waterkeeper's comments and proposed changes to the SWPPP, Defendant shall consider each of the comments and proposed changes and either accept them or justify in writing why a change is not incorporated. The Parties agree to work in good faith to resolve any disputes with respect to the SWPPP, and any remaining disputes will be resolved through timely initiation of the dispute resolution procedures in Section IV below. Following its incorporation of proposed modification or additions (if any) into each revised SWPPP, Defendant shall upload the revised SWPPP to SMARTS.

**D.    COMPLIANCE MONITORING AND REPORTING**

30.    LA Waterkeeper may conduct one annual site inspection ("Site Inspection") during each Reporting Year during the Term for the purpose of ensuring compliance with this Consent Decree and the General Permit. In the event of a dispute regarding Defendant's compliance with this Consent Decree, and provided a Site Inspection would be relevant to resolving the Parties' dispute, the Parties agree to meet and confer regarding an additional Site Inspection at Plaintiff's request. Plaintiff shall not unreasonably request, and Defendant shall not unreasonably deny, one

1  additional Site Inspection. Any Site Inspection shall occur during normal business

2  hours, and LA Waterkeeper will provide Defendant with no less than forty-eight (48)

3  hours' notice prior to a Site Inspection. For any Site Inspection requested to occur in

4  wet weather, Plaintiff will provide at least twenty-four (24) hours' notice, and shall

5  be entitled to adjust timing or reschedule during normal business hours in the event

6  the forecast changes and anticipated precipitation appears unlikely, and thus frustrates

7  the purpose of visiting the Facility in wet weather. Notice will be provided by

8  electronic mail to the individual(s) designated below at paragraph 58. During the Wet

9  Weather inspection, Plaintiff may request that Defendant collect a sample of

10 industrial storm water discharge from the Facility's designated industrial discharge

11 point(s) referenced in its SWPPP, to the extent that such discharges are occurring.

12 Defendant shall collect the sample and provide a split sample to LA Waterkeeper. LA

13 Waterkeeper's representative(s) may observe the split sample(s) being collected by

14 Defendant's representative. LA Waterkeeper shall be permitted to direct Defendant to

15 take photographs or video recording during any Site Inspection to be provided to LA

16 Waterkeeper.

17      31.   <u>Document Provision</u>. During the Term, Defendant shall notify and

18 submit documents to LA Waterkeeper as follows:

19           a.     Defendant shall copy LA Waterkeeper, by electronic mail to the

20                 individual(s) designated below at paragraph 58, on all compliance

21                 documents, monitoring and/or sampling data, written

22                 communications and/or correspondences (except automated or

23                 non-substantive replies and confirmations), or any documents

24                 related to storm water quality at the Facility that are submitted to

25                 the Regional Board, the State Board, and/or any state or local

26                 agency, county or municipality;

27

28

b.  Within seven (7) business days of receipt by Defendant, send to
LA Waterkeeper, by electronic mail to the individual(s)
designated below at paragraph 58, any compliance document,
inspection report, written communication and/or correspondence
(except automated or non-substantive replies and confirmations),
or any document related to storm water quality at the Facility
received by Defendant from the Regional Board, the State Board,
and/or any state or local agency, county, municipality.

32.  Compliance Monitoring. Defendant shall partially defray costs
associated with Plaintiff's monitoring of Defendant's compliance with this Consent
Decree during the Term by paying sixteen thousand dollars ($16,000.00) within thirty
(30) days of the Entry Date, and four thousand dollars ($4,000) per year that the Term
extends beyond June 30 following three (3) years from the Effective Date, if any,
with the first such payment being paid on June 30 following three (3) years from the
Effective Date, and each subsequent payment on June 30 annually thereafter for the
remainder of the Term. Payments pursuant to this paragraph shall be made via check,
made payable to: "Los Angeles Waterkeeper" via certified mail, return receipt
requested to Los Angeles Waterkeeper, c/o Senior Attorney, 360 E 2nd Street, Suite
250, Los Angeles, CA 90012. Failure to submit payment as required under this
Paragraph will constitute breach of the Consent Decree.

E.  **ENVIRONMENTALLY BENEFICIAL PROJECT, LITIGATION FEES AND
COSTS, MISSED DEADLINES, AND INTEREST**

33.  Environmentally Beneficial Project. To fund environmentally beneficial
project activities that will reduce or mitigate the impacts of storm water pollution
from industrial activities occurring in and around the Dominguez Channel,
Dominguez Channel Estuary, Los Angeles/ Long Beach Harbor Waters, as well as
the beaches and nearshore coastal waters of the Pacific Ocean of Los Angeles

25

1   County, Defendant shall make a payment totaling thirty-two thousand dollars

2   ($32,00.00) to the Rose Foundation made within thirty (30) days of the Entry Date,

3   payable to the Rose Foundation for Communities and the Environment and sent via

4   overnight mail to Rose Foundation, 201 4th Street, Suite 102, Oakland, CA 94607.

5   Failure to submit payment as required under this paragraph constitutes a breach of the

6   Consent Decree.

7        34.    <u>LA Waterkeeper's Fees and Costs</u>. Defendant shall pay a total of eighty-

8   eight thousand dollars ($88,000.00) to LA Waterkeeper to partially reimburse

9   Plaintiff for their investigation fees and costs, expert/consultant fees and costs,

10  reasonable attorneys' fees, and other costs incurred as a result of investigating and

11  filing the lawsuit, and negotiating a resolution of this matter within thirty (30) days of

12  the Entry Date. The payment shall be made payable to: Sycamore Law Inc., Attorney

13  Client Trust Account and delivered by overnight carrier to 1004 O'Reilly Avenue,

14  San Francisco, CA 94129. Failure to submit payment as required under this

15  Paragraph constitutes a breach of the Consent Decree.

16       35.    <u>Missed Deadlines</u>. In the event Defendant fails to submit to LA

17  Waterkeeper any payment, document, report, or communication required by this

18  Consent Decree, Waterkeeper shall provide written notice to Defendant of such

19  missed deadline.  Defendant shall have five (5) business days from receipt of such

20  notice to respond and, if necessary, cure such alleged delinquency.  If Defendant fails

21  to respond, and if necessary, cure such alleged delinquency within five (5) business

22  days of receipt of Waterkeeper's notice, then Defendant shall make a stipulated

23  payment of two hundred fifty dollars ($250) per day until such failure is remedied.

24  All stipulated payments shall be made by check payable to: Rose Foundation for

25  Communities and the Environment, and such funds shall be used for the sole purpose

26  of funding environmentally beneficial projects, as described in paragraph 33.

27  Payment shall be sent via overnight mail to Rose Foundation, 201 4th Street, Suite

28

CONSENT DECREE                                                Case No.: 2:24-cv-04118
125476359.1 0060972-00026

102, Oakland, CA 94607. Defendant agree to make the stipulated payment within fourteen (14) days after the resolution of the event that precipitated the stipulated payment liability.

36.    Interest on Late Payments. Defendant shall pay interest on any payments, fees, or costs owed pursuant to this Consent Decree that are not received by the due date. The interest shall accrue starting the next business day after the payment is due and shall be computed at a rate equal to the lower of: (i) 7% per year (0.583% per month); or (ii) the maximum rate permitted by applicable law. Interest shall continue to accrue daily on any outstanding balance until Defendant is current on all payments then due under this Consent Decree, and shall be paid at the same time that the payments, fees, or costs owed are paid to LA Waterkeeper. Interest on late payments shall be paid by check payable to: Rose Foundation for Communities and the Environment, and such funds shall be used for the sole purpose of funding environmentally beneficial projects, as described in paragraph 33. Payment shall be sent via overnight mail to Rose Foundation, 201 4th Street, Suite 102, Oakland, CA 94607.

## IV.    DISPUTE RESOLUTION

37.    This Court shall retain jurisdiction over this matter for the Term for the purposes of enforcing its terms and conditions, and adjudicating all disputes among the Parties that may arise under the provisions of this Consent Decree. The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

38.    Meet and Confer. Either party to this Consent Decree may invoke the dispute resolution procedures of this Section IV by notifying the other party in writing of the matter(s) in dispute and of the disputing party's proposal for resolution. The Parties shall then meet and confer in good faith (either telephonically or in

CONSENT DECREE                                                    Case No.: 2:24-cv-04118
125476359.1 0060972-00026

1  person) within ten (10) days of the date of the notice in an attempt to fully resolve the
2  dispute no later than thirty (30) days from the date of the meet and confer.

3      39.  <u>Settlement Conference</u>. If the Parties cannot resolve the dispute within
4  thirty (30) days from the date of the meet and confer described in paragraph 38 the
5  Parties agree that the dispute may be submitted for formal resolution by filing a
6  motion before the United States District Court for the Central District of California.
7  The Parties agree to request an expedited hearing schedule on the motion.

8      40.  In resolving any dispute arising from this Consent Decree before the
9  Court, the prevailing Party shall be entitled to seek fees and costs incurred pursuant to
10 the provisions set forth in Section 505(d) of the Clean Water Act, <u>33 U.S.C. §
11 1365(d)</u>, and applicable case law interpreting such provisions, or as otherwise
12 provided for by statute and/or case law.

13 **V.    MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE**

14     41.  <u>Plaintiff's Waiver and Release of Defendant</u>. In consideration of the
15 above, upon the Effective Date of this Consent Decree, Plaintiff, on its own behalf
16 and on behalf of its officers and directors, release Defendant, its officers, directors,
17 managers, employees, members, parents, subsidiaries, divisions, affiliates, successors
18 or assigns, agents, attorneys and other representatives, from and waives all claims
19 that were raised in the 60-Day Notice Letter and/or the Complaint up to and including
20 the Termination Date of this Consent Decree.

21     42.  <u>Defendant's Waiver and Release of Plaintiff</u>. In consideration of the
22 above, upon the Effective Date of this Consent Decree, Defendant, on its own behalf
23 and on behalf of all officers, directors, employees, parents, subsidiaries, affiliates and
24 each of their successors or assigns, release Plaintiff, its officers and directors, from
25 and waives all claims related to the 60-Day Notice Letter and/or the Complaint up to
26 and including the Termination Date of this Consent Decree.

27
28

CONSENT DECREE                                        Case No.: 2:24-cv-04118
125476359.1 0060972-00026

43.     Nothing in this Consent Decree limits or otherwise affects Plaintiff's rights to address or take any position that it deems necessary or appropriate in an informal or formal proceeding before the State Board, Regional Board, EPA, or any other judicial or administrative body on any matter relating to Defendant's compliance at the Facility with the General Permit or the Clean Water Act occurring or arising after the Effective Date.

## VI.    MISCELLANEOUS PROVISIONS

44.     <u>No Admission of Liability</u>. The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation. Neither the Consent Decree nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, or acknowledgement of any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. Defendant maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

45.     <u>Counterparts</u>. This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document. Telecopy and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

46.     <u>Authority</u>. The Parties' undersigned representatives certify that they are fully authorized by the party whom they represent to enter into this Consent Decree. Signatures to this Consent Decree transmitted by facsimile or electronic mail shall be deemed binding.

47.     <u>Construction</u>. The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Permit, the Clean Water Act, or specifically herein. The captions and paragraph headings used in this Consent Decree are for reference only and shall not affect the construction of this Consent Decree.

CONSENT DECREE
125476359.1 0060972-00026                                                    Case No.: 2:24-cv-04118

48.    <u>Full Settlement</u>. This Consent Decree constitutes a full and final settlement of this matter.

49.    <u>Integration Clause</u>. This is an integrated Consent Decree. This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

50.    <u>Severability</u>. In the event that any provision, paragraph, section, or sentence of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

51.    <u>Choice of Law</u>. The laws of the United States shall govern this Consent Decree.

52.    <u>Diligence</u>. Defendant shall diligently file and pursue all required permit applications for any required BMPs and shall diligently procure contractors, labor, and materials needed to complete all BMPs by the required deadlines.

53.    <u>Effect of Consent Decree</u>. Compliance with this Consent Decree does not mean that Defendant is complying with the General Permit, the Clean Water Act, or any other law, rule, or regulation.

54.    <u>Negotiated Settlement</u>. The Parties have negotiated this Consent Decree, and agree that it shall not be construed against the party preparing it, but shall be construed as if the Settling Parties jointly prepared this Consent Decree, and any uncertainty and ambiguity shall not be interpreted against any one party.

55.    <u>Modification of the Consent Decree</u>. This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Parties and approved by the Court. Any request to modify any provision of the Consent Decree, including but not limited to any

1     deadline(s) set forth herein, must be made in writing at least fourteen (14) days before

2     the existing deadline(s) applicable to the provision(s) proposed to be modified.

3        56.    <u>Assignment</u>. Subject only to the express restrictions contained in this

4     Consent Decree, all of the rights, duties and obligations contained in this Consent

5     Decree shall inure to the benefit of and be binding upon the Parties, and their

6     successors and assigns. Defendant shall notify Plaintiff within sixty (60) days of any

7     assignment.

8        57.    <u>Force Majeure</u>. Neither of the Parties shall be considered to be in default

9     in the performance of any of their respective obligations under this Consent Decree

10    when performance becomes impossible due to a Force Majeure event. A Force

11    Majeure event is any circumstance beyond a Settling Party's control, including

12    without limitation, any act of God, war, fire, earthquake, flood, windstorm, pandemic,

13    public health crisis, or natural catastrophe; criminal acts; civil disturbance, vandalism,

14    sabotage, or terrorism; restraint by court order or public authority or agency; or action

15    or non-action by, or inability to obtain the necessary authorizations or approvals from

16    any governmental agency. A Force Majeure event shall not include normal inclement

17    weather for Los Angeles, economic hardship, inability to pay, or employee

18    negligence. Any party seeking to rely upon this Paragraph to excuse or postpone

19    performance shall have the burden of establishing that it could not reasonably have

20    been expected to avoid the Force Majeure event and which by exercise of due

21    diligence has been unable to overcome the failure of performance. The Parties shall

22    exercise due diligence to resolve and remove any Force Majeure event.

23       58.    <u>Correspondence</u>. All notices required herein or any other correspondence

24    pertaining to this Consent Decree shall be, the extent feasible, sent via electronic mail

25    transmission to the e-mail address listed below, or if electronic mail is not feasible,

26    then by certified U.S. mail with return receipt, or by hand delivery to the following

27    addresses:

28

CONSENT DECREE                                Case No.: 2:24-cv-04118
125476359.1 0060972-00026

| If to Plaintiff: | If to Defendant: |
|---|---|
| Los Angeles Waterkeeper | Ariel Garcia Brandt |
| Benjamin Harris | PB Fasteners |
| Madeleine Siegel | EHS Manager or Delegate |
| 360 E 2nd St., Suite 250 | 1700 W. 132nd St. |
| Los Angeles, CA 90012 | Gardena, CA 90249 |
| Email: ben@lawaterkeeper.org | |
| Email: madeleine@lawaterkeeper.org | |
| Phone: (310) 394-6162 | |
| With copies to: | With copies to: |
| Jesse Swanhuyser | Laura Kerr |
| Sycamore Law. Inc. | Stoel Rives LLP |
| 1004 O'Reilly Avenue Ste. 100 | 760 SW 9th Ave. #3000 |
| San Francisco, CA 94129 | Portland, OR 97205 |
| jesse@sycamore.law | Laura.Kerr@stoel.com |
| (805) 689-1469 | (503) 294-9176 |

Notifications of communications shall be deemed submitted three (3) days after the date that they are postmarked and sent by first-class mail, or immediately after acknowledgement of receipt via email by the receiving party. Any change of address or addresses shall be communicated in the manner described above for giving notices.

59.    If for any reason the Federal Agencies should object to entry of this Consent Decree or to any portion of this Consent Decree or the Court should decline to approve this Consent Decree in the form presented, the Parties shall use their best efforts to work together to modify the Consent Decree within thirty (30) days so that it is acceptable to the Federal Agencies or the Court. If the Parties are unable to modify this Consent Decree in a mutually acceptable manner that is also acceptable to the Court, this Consent Decree shall immediately be null and void as well as inadmissible as a settlement communication under Federal Rule of Evidence 408 and California Evidence Code section 1152.

CONSENT DECREE
125476359.1 0060972-00026

Case No.: 2:24-cv-04118

1    The Parties hereto enter into this Consent Decree and submit it to the Court for

2  its approval and entry as a final judgment.

3

4    IN WITNESS WHEREOF, the undersigned have executed this Consent Decree

5  as of the date first set forth below.

6

7  APPROVED AS TO CONTENT

8

9  Dated: _____9/22_____, 2024          By: _ *Bruce Reznik* _____
                                            Bruce Reznik
10                                          Executive Director
                                            LOS ANGELES WATERKEEPER
11

12

13 Dated: _____09/20_____, 2024          By: _ *[signature]* _____
                                            John DeSpirito
14                                          General Manager
                                            SPS TECHNOLOGIES LLC
15

16 APPROVED AS TO FORM

17

18 Dated: __September 20__, 2024         By: _ *Jesse Swanhuyser* _____
                                            Jesse Swanhuyser
19                                          Partner
20                                          SYCAMORE LAW, INC.
                                            Attorneys for Plaintiff
21                                          LOS ANGELES WATERKEEPER
22

23

24 Dated: __9/20/2024__, 2024           By: _ *Laura Kerr* _____
                                            Laura Kerr
25                                          Partner
                                            STOEL RIVES LLP
26                                          Attorneys for Defendant
27                                          SPS TECHNOLOGIES LLC

28

CONSENT DECREE                                        Case No.: 2:24-cv-04118
125476359.1 0060972-00026

1  **IT IS SO ORDERED.**

2  **FINAL JUDGMENT**

3

4      Upon approval and entry of this Consent Decree by the Court, this Consent

5  Decree shall constitute a final judgment between the Plaintiff and Defendant.

6

7  Dated: November 4, 2024

8                                               _____
                                                MICHAEL W. FITZGERALD

9                                               United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Docusign Envelope ID: 29CBCD5A-9G96-4AEA-A4B5-516971A3DFE6

Attachment 1

## AERIAL DEPOSITION SAMPLING STUDY

An aerial deposition study is being conducted to determine potential impacts of the aerial deposition of specific pollutants on surfaces exposed to stormwater at the facility located at 1700 W. 132nd Street in Gardena, California. Sampling locations have been strategically identified to determine the impacts of the aerial deposition of pollutants from ambient air at both on-site and off-site locations. On the proposed aerial deposition sampling locations map, sample numbers AD-1, AD-2, AD-3, and AD-4 are representative of the impacts of aerial deposition from ambient air at off-site locations. Sample locations AD-5, AD-6, AD-7, AD-8, and AD-9 are representative of the impacts of aerial deposition at the facility. While AD-10, AD-11, AD-12, and AD-13 represent a middle point between on-site and off-site sources. The intention of this layout is to determine if differences exist between the aerial deposition of pollutants from ambient air at on-site and off-site locations.

If it is determined that the "background" pollutant levels detected at off-site sampling locations, when compared to the on-site and adjacent sample locations, are similar or equal to one another, it will demonstrate that atmospheric emissions resulting from industrial processes at the facility are not resulting in stormwater pollutant loading.

Sample numbers AD-1, AD-2, AD-3, and AD-4 are representative of the impacts of aerial deposition from ambient air at off-site locations.  Sample locations AD-5, AD-6, AD-7, AD-8, AD-9, AD-12, and AD-13 are representative of the impacts of aerial deposition at the facility, with the latter two locations in the portion of the facility with vehicle traffic.  AD-10 and AD-11 represent a middle point between on-site and off-site sources.  For purposes of the statistical analysis, the results from the two plates each at AD-1, AD-2, AD-3, and AD-4 shall be pooled as one group and those at AD-5, AD-6, AD-7, AD-8, AD-9, AD-12, and AD-13 as a second group.  Each parameter in the two groups shall be tested for statistically significant difference using Welch's t-test for unequal sample sizes (e.g., https://www.statology.org/welchs-t-test/), using the t critical value that corresponds to a two-tailed test with alpha = 0.05 for the applicable degrees of freedom.  If a statistical difference is not present for a parameter, the facility will not be considered to contribute significantly to the presence of that parameter in stormwater; and it need not be analyzed in future stormwater samples.  On the other hand, if the concentrations of a parameter are significantly higher in the second group (AD-5 to 9 and 12-13), the facility shall analyze that parameter according to the relevant terms in this consent decree, compare the results to the Table 1 limits, and take the specified actions accordingly.

The aerial deposition study is to be conducted during the 2024/2025 or 2025/2026 stormwater compliance periods. The preference is to complete the study during the dry season (June through September); however, it may be completed during the wet season if no rainfall events occur during the 10-day sampling period.

ALL4 ● info@all4inc.com ● www.all4inc.com

STRATEGY WITH SOLUTION. PARTNERSHIP WITH A PURPOSE.

Docusign Envelope ID: 29CBCD5A-9G96-4AEA-AAB5-516971A3DFE6

## Aerial Deposition Sampling Procedure

Ensure the sampling site is free from disturbances that could affect the results (e.g., sheltered from direct wind).

### *Analytical Parameters:*
Aluminum (total)
Copper (total)
Iron (total)
Nickel (total)
Zinc (total)

### *Equipment and Materials:*

- Clean glass plates
- Distilled water
- pH-neutral detergent
- Nitrile gloves
- Collection containers or plastic bags for transporting plates
- Labels and markers

### *Preparation:*

1. Collect two glass plates for each sample point. Make sure the correct amount of glass plates are prepared in advance of mobilization to site.
2. Wash glass plates with pH-neutral detergent to wash off any residues.
3. Rinse thoroughly with distilled water after washing.
4. Rinse with 91% isopropyl alcohol (IPA).
5. Air dry in a clean, dust-free environment.
6. Label/number bottom of plates with a Sharpie. Allow to dry fully.
7. Handle plates with tweezers or gloves to avoid contamination.
8. Place each individual plate into its own clean, labeled Zip-loc bags for transfer.

### *Testing:*

1. Place two glass plates at each of the selected sampling locations (see Proposed Aerial Deposition Sampling Locations). Secure glass plates to sample location using tape or adhesive, if needed to prevent movement of plate by wind.
2. Record the placement details, take photos of the plate and general vicinity, and exposure start time.
3. Blanks will remain clean and in Ziploc bags.

### *Collection:*

1. After 10 days, retrieve the plates carefully using tweezers or gloves.
2. Record exposure end time and any observations related to the condition of the plates based on visual observations.



ALL4 • www.all4inc.com

3.  Rinse plate with 500 mL of deionized (DI) water.
4.  Collect the sample water in a new collection container/bottle before transferring the required amounts to each sample bottle.
5.  Properly label, package, and containerize the sample bottles on ice and send to the lab.
6.  Blank will be rinsed with 500 mL of DI water.

Docusign Envelope ID: 29CBCD5A-9G96-4AE4-AMB5-F16971A3DEE6

